# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| STEVE RIBACK, an individual, | Case No.: 2:07-cv-1152-RLH-LRL |
| Plaintiff, | **O R D E R** |
| vs. | (Motion for Partial Summary Judgment–#98; Motion for Partial Summary Judgment–#99) |
| LAS VEGAS METROPOLITAN POLICE DEPARTMENT; DOUG GILLESPIE, in his official capacity as SHERIFF of the LAS VEGAS METROPOLITAN POLICE DEPARTMENT; STAVROS ANTHONY, in his official and individual capacities; WALTER NORRIS, in his official and individual capacities, | |
| Defendants. | |

      Before the Court is Defendants Las Vegas Metropolitan Police Department, Doug Gillespie, Stavros Anthony, and Walter Norris' **Motion for Partial Summary Judgment** (#98), filed June 4, 2008, and accompanying document (#100), filed June 5, 2008. The Court has also considered Plaintiff Steve Riback's Opposition (#102), filed June 23, 2008, and Defendants' Reply (#103), filed July 7, 2008.

      Also before the Court is Plaintiff's **Motion for Partial Summary Judgment** (#99), filed June 4, 2008. The Court has also considered Defendants' Opposition (#101), filed June 23, 2008, and Plaintiff's Reply (#104), filed July 7, 2008.

1

AO 72
(Rev. 8/82)

**BACKGROUND**

Steve Riback ("Riback") is an officer of the Las Vegas Metropolitan Police Department ("Metro") and an Orthodox Jew. His faith requires that he wear a beard and cover his head; his profession requires that he shave and not wear a hat indoors. This case arises from Riback's request for religious accommodation.

At some point during his tenure at Metro, Riback began observing the tenets of Orthodox Judaism. At the time, however, he worked undercover in Metro's Vice Squad, which permitted him to wear a beard and baseball cap. But the undercover assignment created other conflicts with his faith. It sometimes required him to work on the Jewish Sabbath and to participate in squad lunches at non-kosher restaurants. After requesting accommodation, Metro permitted him to skip the squad lunches at non-kosher restaurants but could not guarantee that he would not be assigned to work on his Sabbath. Riback then met with Metro's diversity director, Sam Bethel, to discuss his options. Following their discussions, Riback transferred to Metro's non-uniformed Quality Assurance unit because the officers there typically only worked Monday through Friday.

Upon his arrival in Quality Assurance, Riback met with his immediate supervisor, Lieutenant Farrell ("Farrell), and received temporary permission to wear a trimmed beard and a yarmulke. After six weeks, Deputy Chief Ault noticed Riback's beard and ordered that Farrell ensure that Riback's appearance conformed with Metro's personal appearance and grooming

//
//
//
//
//
//
//

policy.[1] Farrell then met with Riback, and as a result of that meeting, Riback shaved his beard. Farrell said nothing about the yarmulke, however, and Riback continued to wear it.

Riback then emailed the new diversity director, Curt Norris ("Norris"), requesting a formal religious accommodation for his beard and yarmulke. He explained that he was aware of the no-beard grooming policy, but that Metro made exceptions for officers with medical conditions. Further, he wrote that while no one had instructed him not to wear his yarmulke, he wanted to clarify his rights in case a situation did arise.

Metro subsequently denied Riback's accommodation requests. According to Metro's denial letter: (1) beards prevent the proper fitting of gas masks, (2) beards provide

---

[1] The relevant portions of Metro's dress and grooming policy read:

**4/107.01      PERSONAL APPEARANCE**
**                A.S. 26.1.1**

It is the policy of this department to ensure that all personnel portray the most favorable image of law enforcement and local government. Such image should reflect the highest professional standards consistent with public expectations of a disciplined organization which demonstrates confidence and trust. No member of the public, whether young child or elderly victim should be allowed to feel uncomfortable or threatened by the dress or personal appearance of a member of this department. . . .

MALE OFFICERS

Hair shall be neat, clean, trimmed, and present a well-groomed appearance. . . . Full or partial beards, goatees, or other facial hair not falling within the criteria of this regulation shall not be permitted.

**4/107.03      WEARING CIVILIAN CLOTHING**
**                A.S. 26.1.1**

The following general guidelines have been established for all personnel wearing civilian attire. Bureau/area commanders are authorized to adjust these guidelines to suit the individual needs of their respective units, upon approval of the division commander. . . .

Hats may be worn, while maintaining a professional appearance, when outside or in a vehicle but must be removed when entering any building.

(Def.'s Mot. Ex. 9 at 98; Pl.'s Mot. Ex. 16 at 106.)

AO 72
(Rev. 8/82)

additional means for a suspect to gain an advantage when engaged in combat with an officer, and (3) beards undermine officer uniformity. Metro also stated that Riback could not wear his yarmulke because wearing religious symbols would undermine officer neutrality and erode public trust.

Riback filed this action on August 28, 2007, after receiving notice of right to sue from the U.S. Equal Employment Opportunity Commission. In his Complaint, Riback asserted claims for (1) violation of the First and Fourteenth Amendment right of free exercise of religion; (2) violation of the Nevada Constitution Article 1, § 4 right of free exercise of religion; (3) violation of the Fourteenth Amendment right of equal protection; (4) violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1)–(2); (5) retaliation pursuant to 42 U.S.C. § 2000e-3(a); (6) employment discrimination pursuant to Nev. Rev. Stat. § 613.330; (7) retaliation pursuant to Nev. Rev. Stat. § 613.340; (8) intentional infliction of emotional distress; and (9) violation of the First and Fourteenth Amendment right of free speech.

On November 16, 2007, the Court held a hearing on Riback's Motion for Preliminary Injunction. Following the hearing, the Court preliminarily enjoined Metro from punishing Riback for wearing a quarter-inch beard. However, it allowed Metro to enforce any violation of its headgear policy if Riback wore a yarmulke or baseball cap when not permitted.

Both sides now move for summary judgment. Riback moves for partial summary judgment on his state and federal constitutional, Title VII, and Nev. Rev. Stat. § 613.330 claims against Metro and Gillespie. Metro, Gillespie, Anthony, and Norris move for partial summary judgment on Riback's third, fourth, sixth, seventh, eighth, and ninth claims. For the reasons discussed below, the Court grants Riback's Motion with respect to his First Amendment claim to wear a beard. It also grants Metro's Motion with respect to Riback's equal protection, free speech, state law employment discrimination, state law retaliation, and punitive damages claims, as well as all claims against Anthony and Norris in their individual capacities. In all other respects, the Motions are denied.

## DISCUSSION

I.  **Summary Judgment Standard**

A court will grant summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party, and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 249 (1986). In evaluating a motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982).

The movant bears the burden of showing that there are no genuine issues of material fact. *Id.* "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the movant satisfies the requirements of Rule 56, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

II.  **Plaintiff's Motion for Partial Summary Judgment**

Riback moves for summary judgment on his first claim under the Free Exercise Clause, his second claim under Nevada Constitution Article 1, § 4, his fourth claim under Title

VII, and his sixth claim for employment discrimination pursuant to Nev. Rev. Stat. § 613.330. Before evaluating his claims, the Court first addresses the threshold issue of how to properly analyze Riback's multiple requests for accommodation.

### A.  Multiple Requests for Accommodation

The Parties analyze Riback's requests for accommodation under separate frameworks. Metro contends that Riback's accommodation requests must be analyzed collectively, urging the Court to consider its past accommodation of Riback's Sabbath observance and kosher restrictions when determining its obligations to accommodate his beard and yarmulke. It argues that because it previously accommodated Riback, it has already satisfied its obligations to accommodate under the First Amendment and Title VII. Riback, on the other hand, argues that the Court should consider each request individually, without considering prior accommodations.

The Court concludes that it must examine each request for accommodation separately. Metro's obligation to comply with the First Amendment and Title VII is ongoing and unaltered by its prior decisions to accommodate Riback's observance of kosher laws and the Sabbath. The Ninth Circuit has held that "[e]fforts at reasonable accommodation in a previous position may constitute admissible evidence with respect to the employer's motives or bona fides, but such *prior* efforts do not constitute compliance, in whole or in part, with the employer's obligations to take steps toward accommodation with respect to the new position." *Proctor v. Consol. Freightways Corp. of Del.*, 795 F.2d 1472, 1477 (9th Cir. 1986) (emphasis in original).

Evaluating accommodation requests collectively could also lead to inconsistent results. A simple example illustrates why: suppose two officers request an identical religious accommodation and that one officer has already received an accommodation for a different religious practice. If the prior accommodation satisfied the department's accommodation duties, the police department could be obligated to grant one officer's request, but permitted to deny the other's identical request simply because it had already accommodated that officer once before.

Moreover, to hold otherwise would prejudice religious adherents whose beliefs

6

1  require a greater quantity of accommodation, and it is neither the Court's nor Metro's prerogative
2  to decide if a religion requires too much from its adherents.  In our "cosmopolitan nation made up
3  of people of almost every conceivable religious preference," *Braunfield v. Brown*, 366 U.S. 599,
4  606 (1961), the demands of police work will undoubtedly create more conflicts for adherents of
5  some religions than for others.  But there is no constitutional cap on the amount of religious
6  accommodation an individual may seek.  Instead, courts and employers must independently
7  evaluate each accommodation request, irrespective of how many previous requests have been
8  granted or denied or which religion it derives from.  And while this may still "place at a relative
9  disadvantage those religious practices that are not widely engaged in," *Employment Div., Dep't of*
10 *Human Res. of Or. v. Smith*, 494 U.S. 872, 890 (1990), the Court will at least have acted in a
11 religiously neutral, even-handed manner.
12         Having determined that it must evaluate each accommodation request individually,
13 the Court now examines Riback's free exercise and Title VII claims.
14         **B.    Claim 1: First and Fourteenth Amendment Right to Free Exercise of Religion**
15         Riback challenges Metro's refusal to accommodate his request to wear a religious
16 beard and yarmulke as violative of the Free Exercise Clause.
17         The First Amendment provides that "Congress shall make no law respecting an
18 establishment of religion, or prohibiting the free exercise thereof."  U.S. Const. amend. I.  It
19 applies to the States by incorporation into the Fourteenth Amendment.  *Cantwell v. Connecticut*,
20 310 U.S. 296, 303 (1940).  "The free exercise of religion means, first and foremost, the right to
21 believe and profess whatever religious doctrine one desires."  *Smith*, 494 U.S. at 877.  But "the
22 right of free exercise does not relieve an individual of the obligation to comply with a 'valid and
23 neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct
24 that his religion prescribes (or proscribes).'"  *Id.* at 879 (quoting *United States v. Lee*, 455 U.S.
25 252, 263 n.3 (1982) (Stevens, J., concurring)).  Nevertheless, "where the State has in place a
26 system of individual exemptions, it may not refuse to extend that system to cases of 'religious

AO 72
(Rev. 8/82)

1  hardship' without compelling reason." *Id.* at 884 (quoting *Bowen v. Roy*, 476 U.S. 693, 708
2  (1986)).  "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue
3  discriminates against some or all religious beliefs or regulates or prohibits conduct because it is
4  undertaken for religious reasons." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508
5  U.S. 520, 532 (1993).
6     "A law burdening religious practice that is not neutral or not of general application
7  must undergo the most rigorous of scrutiny." *Id.* at 546.  Under strict judicial scrutiny, a law is
8  unconstitutional unless the government can show that it is necessary to achieve a compelling
9  interest.  *See Miller v. Johnson*, 515 U.S. 900, 920 (1995).  Moreover, "[t]he compelling interest
10 standard . . . is not 'water[ed] . . . down' but 'really means what it says.'" *Lukumi*, 508 U.S. at 546
11 (quoting *Smith*, 494 U.S. at 888).  "A law that targets religious conduct for distinctive treatment or
12 advances legitimate governmental interests only against conduct with a religious motivation will
13 survive strict scrutiny only in rare cases." *Id.*

   **1.**  **Request to Wear a Beard**

15    Riback asks the Court to follow the Third Circuit's reasoning in *Fraternal Order of*
16 *Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (3rd Cir. 1999), to find Metro's no-
17 beard policy unconstitutional.  In that case, two Sunni Muslim police officers challenged the
18 Newark Police Department's zero-tolerance, no-beard policy for officers that had not received a
19 medical waiver.  *Id.* at 361.  Then-Judge Alito, writing for the court, found that heightened
20 scrutiny applied under *Smith* and *Lukumi* because the policy "create[d] a categorical exemption for
21 individuals with a secular objection but not for individuals with a religious objection." *Id.* at 365.
22 In applying heightened scrutiny, it found that the medical exemption undermined the Department's
23 interests in uniform appearance and officer morale, because it failed to explain why religious
24 beards and not medical beards frustrated these interests.  *Id.* at 366–67.  The Third Circuit also
25 rejected the Department's argument that it only granted medical exemptions because the ADA
26 required it, because "Title VII . . . imposes an identical obligation on employers with respect to

8

1  accommodating religion." *Id.* at 365.  Further, it found that the Department's partial no-beard

2  policy was not tailored to protect public safety.  *Id.* at 366.  Consequently, it found the

3  department's policy violated the Free Exercise Clause of the First Amendment.  *Id.* at 367.

4        Metro apparently concedes that strict scrutiny is appropriate, but contends that this

5  case is different than *Fraternal Order*.  First, it contends that police work in Las Vegas, Nevada is

6  substantially more difficult than in Newark, New Jersey, and so Metro's interests are more

7  compelling.  Next, Metro claims that the Newark Police Department only proffered interests to

8  survive rational basis review because it did not believe heightened scrutiny applied.  Here

9  however, Metro claims its interests are compelling and survive even strict scrutiny.  Metro argues

10  it has a compelling interest in maintaining a religiously neutral appearance for its officers both for

11  public safety and to not violate the Establishment Clause.  Metro also claims that as a paramilitary

12  organization, it has a compelling interest in maintaining the uniform personal appearance of its

13  officers to promote cooperation, foster esprit de corps, reinforce its hierarchal command structure,

14  and portray authority to the public.  The Court analyzes each of Metro's arguments in turn.

15        **a.**    **Demographic Differences Between Las Vegas and Newark**

16        In an attempt to distinguish *Fraternal Order*, Metro contends that "[t]he

17  composition of the city of Las Vegas and [Metro] are entirely different from the city of Newark

18  and the Newark Police Department." (Dkt. #101, Opp'n 14.)  It cites statistics showing that Metro

19  has roughly three times more officers and employees, that it is responsible for an area roughly the

20  size of the entire state of New Jersey, and that it polices a permanent and transient population

21  roughly 150 times the population of Newark.  (*Id.*)  It concludes, "[Metro] is truly a unique police

22  department, and the diversity burdens that [it] face[s] are much greater than those of the Newark

23  Police Department." (*Id.*)

24        As an initial matter, the Court is skeptical that police work in Las Vegas is as

25  dramatically different from Newark as Metro claims.  To the extent Las Vegas' size and diversity

26  impact Metro's interests in officer neutrality and uniformity, the Court examines those interests

separately. But the Court is at pains to understand how Metro's compelling demographics give it a compelling interest to deny an officer's request to wear a beard for religious reasons, but permit it to grant a waiver for medical reasons. The Court finds that Las Vegas' and Newark's demographic differences provide no cognizable basis to distinguish this case from *Fraternal Order*.

### b.   Religious Neutrality

The Court recognizes the importance of Metro's officers maintaining a religiously neutral appearance so as to appear free of personal bias. Officers routinely respond to emergency situations that involve conflict and danger. If officers wore sectarian symbols, it could escalate an already precarious situation. It would also undermine the citizenry's perception of the police as a neutral, unbiased, secular, civil authority, and could be interpreted to mean that the government preferred or endorsed a particular religion.

But, in the Court's view, those concerns are not present in this case. First, most people are unlikely to view a closely-trimmed beard—like the quarter-inch beard Riback requests—as a religious symbol. This is especially true if other officers wear beards for medical reasons, because there is nothing to indicate that one beard is worn for secular reasons while the other is for religious. Second, Riback only requests permission in this case to wear a beard while assigned to Quality Assurance.[2] In his current position, he has limited public exposure and does not wear a uniform. Consequently, the possibility of citizens perceiving his beard to be a religious symbol, already unlikely, is lessened.

### c.   Uniform Appearance

Metro also asserts that as a paramilitary organization, it has a compelling interest in maintaining the uniform personal appearance of its officers to promote cooperation, foster esprit

---

[2] In his deposition, Riback expressed that he would expect to be able to wear his beard and yarmulke in any assignment at Metro. (Def.'s Mot. Ex. A at 235–39.) Nevertheless, the only relief he has formally requested from this Court is to be able to wear a beard while at his current assignment in Quality Assurance. Consequently, the scope of the Court's decision is limited to his assignment in Quality Assurance.

1  de corps, reinforce its hierarchal command structure, and portray authority to the public. The
2  Court acknowledges that Metro's interests in maintaining a uniform personal appearance is
3  significant. However, like the Newark Police Department in *Fraternal Order*, Metro fails to
4  explain why religious beards undermines this interest, but medical beards do not.

5          **d.**        **Metro Must Permit Religious Exemptions to Its No-Beard Policy Subject to the Same Restrictions as Medical Exemptions**

7  Consequently, the Court adopts the reasoning of the Third Circuit in *Fraternal*
8  *Order*. It finds that Metro's no-beard policy does not survive heightened scrutiny and thus violates
9  the First Amendment. As such, the Court grants summary judgment on Riback's first claim with
10 respect to his request to wear a beard. Metro must allow Riback to wear a beard while in Quality
11 Assurance, subject to the same restrictions on officers who wear beards for secular reasons.

12         **2.**        **Request to Wear a Yarmulke**

13 While the Court applied heightened scrutiny to Metro's no-beard policy because it
14 permitted secular exemptions but denied the same exemption for religious reasons, the Court
15 evaluates Metro's headgear policy under *Smith*'s general rule. Under *Smith*, "the right of free
16 exercise does not relieve an individual of the obligation to comply with a valid and neutral law of
17 general applicability on the ground that the law proscribes (or prescribes) conduct that his religion
18 prescribes (or proscribes)." *Id.* at 879 (quotations omitted). Metro's headgear policy applies to all
19 officers and there is no evidence that it is motivated by religious animus. Accordingly, Riback's
20 right of free exercise does not relieve him of his duty, as a Metro officer, of complying with
21 Metro's headgear regulations.

22 Riback argues that strict scrutiny should apply because "pervasive religious
23 expression occurs daily at Metro." (Dkt. #99, Mot. 15:14–15.) He asserts that other officers have
24 religious symbols on their desks and in their offices and that Metro used to permit Christian pins
25 on the uniform. Nevertheless, Metro's regulations concerning desk and office decorations or even
26 uniform pins are not at issue. The specific policy Riback challenges is Metro's headgear policy,

which requires that he wear only approved headgear (not his yarmulke) and only at approved times (not indoors). Riback provides no evidence that the regulation is not neutral or generally applicable to all Metro officers. Moreover, the regulation does not provide individualized exemptions for any reason, secular or religious. Consequently, the Court finds that Metro's headgear policy does not violate the Riback's rights under the Free Exercise Clause and denies summary judgment on this issue.

### C. Claim 2: Nevada Constitution Article I, § 4 Right to Free Exercise of Religion

Article I, § 4 of the Nevada Constitution provides: "The free exercise and enjoyment of religious profession and worship without discrimination or preference shall forever be allowed in this State . . . but the liberty of consciene [conscience] hereby secured, shall not be so construed, as to excuse acts of licentiousness or justify practices inconsistent with the peace, or safety of this State." (brackets in original) The Court is not aware of any case law indicating that the Nevada Constitution's Free Exercise Clause provides any greater or lesser protection than its federal equivalent. Consequently, the Court finds that Riback is not entitled to additional relief under the Nevada Constitution and denies summary judgment on his second claim.

### D. Claim 4: Violation of Title VII of the Civil Rights Act of 1964

Title VII prohibits religious discrimination in employment. 42 U.S.C. § 2000e-2(a)(1). It defines religion to include "all aspects of religious observance and practice, as well as belief." § 2000e(j). Courts evaluate Title VII religious discrimination claims under a two-part framework. *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1438 (9th Cir. 1993). First, the employee must establish a prima facie case by proving (1) he had a bona fide religious belief that conflicted with an employment duty, (2) he informed his employer of the belief and conflict, and (3) he was threatened or subjected to discriminatory treatment because of his inability to fulfill the job requirements. *Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 681 (9th Cir. 1998). But, "[t]he prima facie case does *not* include a showing that the employee made any efforts to compromise his or her religious beliefs or practices before seeking an accommodation." *Heller*, 8 F.3d at 1438

AO 72
(Rev. 8/82)

(emphasis in original).  Second, if the employee proves his prima facie case, the burden shifts to the employer to show it made good-faith efforts to reasonably accommodate the employee's religious practice or that accommodation would cause it an undue hardship.  *Tiano*, 139 F.3d at 681.

### 1. Prima Facie Case

Riback asserts that (1) he has a bona fide religious belief that requires him to wear a beard and to cover his head, (2) that he informed his employer of his religious belief, and (3) that he was threatened with discriminatory treatment if he continued to wear a beard and yarmulke to work.  Metro in its Opposition contests only the first prong, asserting that it is a question of fact for the trier of fact whether Riback's beliefs are sincerely held.  But it is only a question of fact if the facts are disputed, and here they are not.  Riback testified in his deposition that his beliefs are sincerely held, and his rabbis testified that his beliefs are rooted in Jewish theology.  Further, no Metro employee has disputed the sincerity of his beliefs, nor has Metro produced any evidence that would cause the Court to doubt Riback's sincerity.  *See, e.g.*, *E.E.O.C. v. Unión Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49, 56–57 (1st Cir. 2002) (court doubted sincerity of religious beliefs because defendant produced evidence that the plaintiff often acted inconsistent with these beliefs), *but cf. E.E.O.C. v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 614 n.5 (9th Cir. 1988) ("An employee does not cease to be discriminated against because he temporarily gives up his religious practice and submits to the employment policy.").  Without some modicum of evidence that Riback's beliefs are not sincerely held, the Court must accept Riback's evidence as undisputed.  Accordingly, the Court finds that Riback has established a prima facie case of religious discrimination under Title VII.

### 2. Good Faith Effort to Accommodate or Undue Hardship

"Once an employee proves a prima facie case under Title VII, the burden shifts to the employer to show that it undertook some initial step to reasonably accommodate the religious belief of that employee."  *Heller*, 8 F.3d at 1440.  At a minimum, it requires that an employer

1  "negotiate with the employee in an effort reasonably to accommodate the employee's religious
2  belief." *E.E.O.C. v. Hacienda Hotel*, 881 F.2d 1504, 1513 (9th Cir. 1989), *overruled on other*
3  *grounds by Burrell v. Star Nursery, Inc.*, 170 F.3d 951 (9th Cir. 1999). But an "employer need not
4  make such an effort if it can show that any accommodation would impose undue hardship."
5  *Heller*, 8 F.3d at 1440. "An accommodation causes an 'undue hardship' when it results in more
6  than a *de minimis* cost to the employer." *Id*.

The Court has already found Metro's no-beard policy invalid under the Free Exercise Clause, and it notes that it would reach the same result under Title VII. However, the Court finds that there are genuine issues of material fact that preclude summary judgment on whether Metro made a good faith effort to accommodate Riback's request to wear a yarmulke, or alternatively a baseball cap, and whether Riback's request imposes an undue hardship on Metro. Therefore, the Court denies summary judgment on Riback's Title VII claim.

### E.   Claim 6: Employment Discrimination Per Nev. Rev. Stat. § 613.330

Riback's claim under Nev. Rev. Stat. § 613.330 is analyzed under the same framework as his Title VII claim. *See Pope v. Motel 6*, 114 P.3d 277, 280 (Nev. 2005) ("In light of the similarity between Title VII of the 1964 Civil Rights Act and Nevada's anti-discrimination statutes, we have previously looked to the federal courts for guidance in discrimination cases.") As such, the Court denies Riback's Motion for Partial Summary Judgment on his sixth claim for the same reasons it denies summary judgment on his Title VII claim. Moreover, the Court addresses Metro's immunity defense in its analysis of Metro's Motion for Partial Summary Judgment. *See infra* Part III.E.

### F.   Summary

For the reasons discussed above, the Court grants Riback's Motion for Partial Summary Judgment on his first claim only with respect to his request to wear a beard; on all other claims and issues, the Motion is denied.

//

AO 72
(Rev. 8/82)

**III.     Defendants' Motion for Partial Summary Judgment**

Metro, Gillespie, Norris, and Anthony move for summary judgment on Riback's claims for punitive damage, equal protection, violation of Title VII, state law employment discrimination and retaliation, intentional infliction of emotional distress, and free speech.

**A.     Punitive Damages and Claims Against Captain Anthony and Director Norris**

Riback drops his claims against Captain Anthony and Director Norris in their individual capacities and all claims to punitive damages. Accordingly, the Court grants Metro's Motion for Partial Summary Judgment on these claims.

**B.     Claim 3: Fourteenth Amendment Right to Equal Protection of the Laws**

The Equal Protection Clause of the Fourteenth Amendment provides, "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Equal protection creates no substantive rights, but instead, requires that States treat like cases the same. *Vacco v. Quill*, 521 U.S. 793, 799 (1997). It "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Its purpose "is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Sunday Lake Iron Co. v. Wakefield TP*, 247 U.S. 350, 352 (1918).

In its Motion, Metro argues that Riback failed to produce any evidence supporting his equal protection claim. In response, Riback asserts that Metro's processing of his accommodation request was arbitrary. He also contends that Metro treated him differently from other officers who were similarly situated, because other officers were permitted to engage in religious expression, but he was not allowed to wear his yarmulke.

First, the Equal Protection clause protects against arbitrary discrimination and not arbitrary processes. It ensures that like cases are treated alike, not that a process comports with

//

15

minimum standards of fairness.[3] Second, Riback's argument that he was treated differently from other officers also fails. His argument overlooks the fact that the "Fourteenth Amendment does not regard neutral laws as invidious ones, *even when their burdens purportedly fall disproportionately on a protected class*." *Crawford v. Marion County Election Bd.*, 128 S. Ct. 1610, 1626 (2008) (emphasis in original). Consequently, even though the burden of Metro's headgear policy may disproportionately impact a protected class of religionists, the regulation is not invidious. As such, Metro need only justify the regulation under rational basis review. This is readily accomplished because the regulation advances Metro's interest in promoting the professional and uniform appearance of its officers. Accordingly, the Court grants summary judgment and dismisses Riback's third claim.

**C.    Claim 4: Violation of Title VII of the Civil Rights Act of 1964**

As the Court stated previously, it finds genuine issues of material fact that preclude summary judgment on Riback's Title VII claim. *See supra* Part II.D. Metro's Motion for Partial Summary Judgment on this claim is therefore denied.

**D.    Claims 6 & 7: Employment Discrimination and Retaliation Under Nev. Rev. Stat. §§ 613.330 and 613.340.**

Metro argues that Riback's state law claims against Metro and Gillespie are barred by Nev. Rev. Stat. § 41.032, which provides immunity for government officers engaged in discretionary acts. The immunity statute provides:

> [N]o action may be brought . . . [b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the State or any of its agencies or political subdivisions or of any officer, employee or immune contractor of any of these, whether or not the discretion involved is abused.

---

[3] Riback does not argue that Metro processed his accommodation request differently than other similarly situated officers, which could be a viable equal protection claim. He only argues that Metro's processing of his request was arbitrary, which is more like a due process claim.

16

1   Nev. Rev. Stat. § 41.032(2). Nevada has recently adopted the United States Supreme Court's
2   *Berkovitz–Gauber* approach for analyzing discretionary-act immunity. *Butler ex rel. Biller v.*
3   *Bayer*, 168 P.3d 1055, 1066 (Nev. 2007). "[T]o fall within the scope of discretionary-act
4   immunity, a decision must (1) involve an element of individual judgment or choice and (2) be
5   based on considerations of social, economic, or political policy." *Martinez v. Maruszczak*, 168
6   P.3d 720, 728 (Nev. 2007).

7         Here, the Court finds that Gillespie and Metro are immune from Riback's state law
8   claims. First, Gillespie and Metro's decision to deny Riback's accommodation request involved
9   an element of individual judgment or choice because they had flexibility in interpreting and
10  potentially modifying the department's dress and grooming regulations. Second, they made their
11  decision after weighing various policy implications. In denying Riback's request, Gillespie and
12  Metro considered its effect on officer safety, including an officer's ability to wear a gas mask and
13  its impact on officer-combatant melees, officer uniformity, and possible conflicts with the
14  Establishment Clause. While Gillespie and Metro's decisions may conflict with the requirements
15  of federal law—and that is at issue in this lawsuit—they are still immune from Riback's state law
16  claims. *See, e.g.*, *Carey v. Nev. Gaming Control Bd.*, 279 F.3d 873, 878–82 (9th Cir. 2002)
17  (finding an officer immune to state law claims under Nevada's discretionary-act immunity statute,
18  Nev. Rev. Stat. § 41.032, but not entitled to qualified immunity for claims brought under 42
19  U.S.C. § 1983 for the same conduct). Accordingly, the Court grants Metro's Motion for Partial
20  Summary Judgment as to Riback's sixth and seventh claims.

21        **E.**    **Claim 8: Intentional Infliction of Emotional Distress**

22        To establish a claim for intentional infliction of emotional distress, Riback must
23  prove: (1) Gillespie's and Metro's conduct was extreme or outrageous with either the intention of,
24  or reckless disregard for, causing him emotional distress, (2) he suffered severe or extreme
25  emotional distress, and (3) their conduct was the actual or proximate cause of his distress. *Olivero*
26  *v. Lowe*, 995 P.2d 1023, 1025 (Nev. 2000). Here, the Court finds that Gillespie and Metro's denial

AO 72
(Rev. 8/82)

1  of Riback's accommodation requests does not rise to the level of extreme or outrageous. Under an
2  intentional infliction of emotional distress theory, "[l]iability is only found in extreme cases where
3  the actions of the defendant go beyond all possible bounds of decency, is atrocious and utterly
4  intolerable." *Alam v. Reno Hilton Corp.*, 819 F. Supp. 905, 911 (D. Nev. 1993). This is not such a
5  case. The Court also finds no evidence that Gillespie or Metro intended to cause Riback emotional
6  distress. As such, the Court grants summary judgment and dismisses Riback's eighth claim.

   **F.     Claim 9: First and Fourteenth Amendment Right to Free Speech**

8           Metro argues that Riback failed to produce any evidence in support of his free
9  speech claim. In his Opposition, Riback analyzes his ninth claim for violation of his free speech
10 rights under the First and Fourteenth Amendment using the same facts and law as his first claim
11 for violation of his rights under the Free Exercise Clause. Accordingly, the Court dismisses
12 Riback's ninth claim as redundant.

   **G.     Summary**

14          As discussed above, the Court grants Metro's Motion for Partial Summary
15 Judgment as to Riback's claims for punitive damages, equal protection, state law discrimination
16 and retaliation, intentional infliction of emotional distress, and free speech, and all claims against
17 Norris and Anthony individually. In all other respects, the Motion is denied.

                                    **CONCLUSION**

19          Accordingly, and for good cause appearing,
20          IT IS HEREBY ORDERED that Defendants' Motion for Partial Summary
21 Judgment (#98) is GRANTED as to Riback's punitive damage claim, individual claims against
22 Anthony and Norris, federal constitutional equal protection claim (Claim 3), state law employment
23 discrimination claim (Claim 6), state law retaliation claim (Claim 7), intentional infliction of
24 emotional distress claim (Claim 8), and federal constitutional free speech claim (Claim 9). It is
25 DENIED as to all other claims and issues.
26 //

                                           18

IT IS FURTHER ORDERED that Plaintiff's Motion for Partial Summary Judgment (#99) is GRANTED as to Riback's federal constitutional free exercise claim (Claim 1) as it relates to his request to wear a beard. It is DENIED as to all other claims.

Dated: August 6, 2008.

_____
ROGER L. HUNT
Chief United States District Judge

19